# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3283 | **DATE** | 8/16/2000 |
| **CASE TITLE** | LCA, INC. vs. SHARP ELECTRONICS CORP. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] LCA's motion to voluntarily dismiss Counts I, II, III, and VI of the amended complaint without prejudice [14-1] is granted. Counts I, II, III, and VI are dismissed without prejudice. Sharp's motion to compel arbitration and to dismiss [10-1] is granted. This action is dismissed without prejudice pending arbitration. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | AUG 2 2 2000 | |
| | Notified counsel by telephone. | date docketed | 17 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING ED-7 00 AUG 21 PM 3:35 | 8/16/2000 date mailed notice |
| WS | courtroom deputy's initials | Date/time received in central Clerk's Office | jad mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LCA, INC., )
)
Plaintiff, ) No. 00 C 3283
)
v. ) Suzanne B. Conlon, Judge
)
SHARP ELECTRONICS CORP. )
) **DOCKETED**
Defendant. )
**AUG 2 2 2000**

## MEMORANDUM OPINION AND ORDER

LCA, Inc. ("LCA") brings multiple claims against Sharp Electronics Corp. ("Sharp") surrounding breach of sales representative agreements between the parties. Sharp moves to compel LCA to arbitrate its claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").

## BACKGROUND

Courts treat motions to compel arbitration as assertions that they are deprived of subject matter jurisdiction during the course of arbitration. Robert Half International, Inc. v. Thompson, 1999 WL 138849, at *1 (N.D. Ill. March 5, 1999) (citing Evans v. Hudson Coal Co., 165 F.2d 970, 972 (3rd Cir. 1948)). Accordingly, the background facts are taken from the parties' pleadings, including attached exhibits and affidavits. Robert Half, 1999 WL 138849, at *1 (citing Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir. 1993)). The court accepts uncontested facts as true. Saylor v. Dyniewski, 836 F.2d 342, 342 (7th Cir. 1988). Where the facts are in dispute, the court accepts LCA's version. Turnock v. Cope, 816 F.2d 332, 333 (7th Cir. 1987).

Sharp makes home and office machinery and electronic products. On August 10, 1987, Sharp and LCA entered into a sales representative agreement. Under the agreement, LCA was Sharp's

exclusive sales representative in various parts of Illinois, Indiana, Iowa, and Wisconsin. LCA was responsible for sales of consumer calculators, portable typewriters, handy copiers, personal copiers, and home facsimile machines in these areas. In exchange for LCA's sales representation services, Sharp paid commissions to LCA. The vast majority of LCA's sales were generated by reaching arrangements with various companies under which those companies would sell Sharp's products in their catalogs, and LCA would receive a commission from Sharp for those sales. LCA also sold Sharp group products through flyers and sales promotions.

The August 1987 agreement provided that if any one of the signatories to the agreement died, the agreement would automatically terminate. On October 15, 1987, Stanley Wasser, Sharp's signatory, died. No new sales agreement was executed between the parties at the time. However, LCA contends an implied contract arose between the parties after termination of the August 1987 agreement based on the sales representative relationship created by that agreement; LCA continued to sell Sharp's products and Sharp continued to pay commissions to LCA. Under the implied contract, LCA was entitled to a commission rate of 1.5% of its sales. However, beginning in April 1997, Sharp unilaterally reduced the commission rate and eventually stopped paying any commissions on LCA's sales to certain accounts.

Meanwhile, on January 1, 1995, Sharp and LCA entered a separate agreement under which LCA became Sharp's independent sales representative for Sharp's laser printers and notebook computers in areas of Illinois and Wisconsin. Prior to awarding this contract, Sharp insisted as a condition precedent that LCA hire Steve Kobrick as a sales representative for the laser printers and notebook computers. LCA did so. Although LCA obtained orders for the laser printers and notebook computers, Sharp refused to timely fill the orders. Both the August 1987 and January 1995

agreements contained arbitration clauses requiring that "[a]ny controversy or claim arising out of or relating to" the agreements or the breach thereof shall be settled exclusively by arbitration in New York City, New York, in accordance with the rules of the American Arbitration Association. Amend. Compl. Ex. A at 18; Ex. B ¶ 15. On March 29, 2000, Sharp terminated the parties' sales representative relationship effective April 30, 2000.

The amended complaint alleges seven counts: breach of implied contract (Counts I & II); violation of the Illinois Sales Representative Act, 820 ILCS § 120/1 *et seq.* (Count III); promissory estoppel (Counts IV & VI); *quantum meruit* (Count V); and violation of the Robinson-Patman Act, 15 U.S.C. § 13 *et seq.* (Count VII). At the same time LCA filed its response to Sharp's motion to compel arbitration, LCA also moved separately to voluntarily dismiss Counts I, II, III, and VI without prejudice. The court grants this motion. Accordingly, the issue remains whether Counts IV, V, and VII are subject to arbitration.

## DISCUSSION

### I. STANDARDS FOR ENFORCING ARBITRATION AGREEMENTS

The central purpose of the FAA is to "ensure that private agreements to arbitrate are enforced according to their terms." Mastrobouno v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 53-54 (1995) (citations omitted). Under the FAA, arbitration is favored "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," S+L+H S.p.A. v. Miller-St. Nazianz, Inc., 988 F.2d 1518, 1524 (7th Cir. 1993), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Mastrobouno, 514 U.S. at 62 n. 8 (quoting Moses H. Cone

Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983)). To further this policy in favor of arbitration, § 3 of the FAA provides, in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit or proceeding is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

LCA bears the burden of establishing why the arbitration clauses should not be enforced. See Shearson/Am. Express v. McMahon, 482 U.S. 220, 225-26 (1987). Both the August 1987 and January 1995 agreements require arbitration of claims "arising out of or relating to" the agreements.[1] Arbitration clauses stating they reach all disputes "arising out of" an agreement cover "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se." Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Ltd., 1 F.3d 639, 642 (7th Cir. 1993). Broad clauses of this type "necessarily create a presumption of arbitrability." Kiefer Speciality Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 910 (7th Cir. 1999).

## II. ROBINSON-PATMAN ACT CLAIM

In Count VII, LCA alleges Sharp violated the Robinson-Patman Act ("RPA") by offering lower prices, better shipment schedules, and better service and support to "favored" customers. LCA

---

[1] As noted, LCA alleges that the August 1987 agreement terminated upon Stanley Wasser's death in October 1987. Sharp argues under several theories that the August 1987 agreement continued to govern after October 1987. The court need not address the continued enforceability of the August 1987 agreement after October 1987 because LCA assumes for purposes of its response that the August 1987 agreement (and its arbitration clause) is enforceable. In fact, LCA requests that the court refrain from addressing the enforceability of the August 1987 agreement. LCA does not contest the validity of the 1995 agreement.

4

alleges the customers comprising its accounts were not among Sharp's favored customers, and that it sold fewer of Sharp's products due to Sharp's decision to favor non-LCA customers over LCA's customers. LCA relies on AlliedSignal, Inc. v. B.F. Goodrich Co., 183 F.3d 568 (7th Cir. 1999), to argue its RPA claim is not subject to arbitration because its antitrust injury is independent and distinct from the August 1987 agreement. In AlliedSignal, AlliedSignal (a manufacturer of wheels and brakes for aircraft landing systems) entered into an agreement with Coltec (a manufacturer of aircraft landing gear apparatus) under which the parties prepared joint bids on aircraft landing systems. The agreement provided for the arbitration of "any claim or controversy arising out of or relating to the Agreement." Id. at 572. When B.F. Goodrich (a competitor of AlliedSignal) sought to merge with Coltec, AlliedSignal sued, claiming it would suffer antitrust injury resulting from an increase in the price it would have to pay for landing gear. B.F. Goodrich argued the antitrust claim was subject to the arbitration clause in the agreement between AlliedSignal and Coltec. To connect the antitrust injury to the agreement, B.F. Goodrich argued the higher prices could occur only if B.F. Goodrich/Coltec breached the agreement. The court disagreed. It explained that the antitrust claim was not subject to arbitration because the AlliedSignal/Coltec agreement did not regulate the price Coltec could charge for its landing gear. Id. at 573. Therefore, B.F. Goodrich "could fully comply with the [agreement] and still cause AlliedSignal antitrust injury by charging uncompetitive prices." Id. Neither that fact nor performance under the agreement had any connection to the claimed injury. Accordingly, the antitrust injury did not arise under the agreement. Id.

Building on AlliedSignal, LCA argues that its RPA claim is not subject to arbitration because Sharp's compliance with the August 1987 agreement has no bearing on the claimed antitrust injury. LCA contends that even if Sharp complied with every term of the August 1987 agreement, Sharp

5

could still cause antitrust injury by continuing to offer non-LCA accounts more favorable pricing and service terms. AlliedSignal must be confined to its facts. AlliedSignal held that the antitrust claim in that case did not arise under the arbitration agreement because the defendant's compliance with the agreement had no bearing on the antitrust injury. The agreement's terms had no relationship to the plaintiff's claim of higher prices in a marketplace dominated by the defendant. However, the August 1987 agreement between LCA and Sharp directly related to the antitrust injury alleged by LCA.[2] LCA's RPA claim complains about its reduced ability to sell Sharp's products under the August 1987 agreement due to Sharp's favorable treatment of non-LCA accounts. That agreement created LCA's status as a Sharp sales representative. Without that status, LCA could not claim injury from Sharp's decision to treat LCA's accounts less favorably. A claim "that draws its very essence from the fact of and performance under the Agreement in question . . . necessarily is a claim that arises out of and relates to the Agreement." S+L+H S.p.A. v. Miller-St. Nazianz, Inc., 988 F.2d 1518, 1524 (7th Cir. 1993). Moreover, simply because Sharp's conduct may violate the RPA, an antitrust statute, does not mean it does not also arise from the August 1987 agreement. Id. ("Simply because [the plaintiff] has asserted a claim based on the [Wisconsin] Fair Dealership Law does not mean that the claim does not arise from or relate to the Agreement"). Accordingly, LCA's RPA claim can fairly be said to it arise out of and relate to the August 1987 agreement.

LCA also relies on Washburn v. Societe Commerciale de Reassurance, 831 F.2d 149 (7th Cir. 1987) to support its argument that its RPA claim is not subject to arbitration. Washburn involved a RICO claim against a reinsurer, alleging the reinsurer fraudulently induced an insurer to continue in

---

[2] The parties scarcely address whether LCA's RPA claim is arbitrable under the January 1995 agreement. The court need not address the issue, as it finds the RPA claim is arbitrable under the 1987 agreement.

6

business past the point of insolvency and to be drained of its most profitable business. A reinsurance agreement between the insurer and reinsurer mandated that only claims relating to the interpretation of, or performance under, the agreement were arbitrable. The court held the arbitration clause did not compel arbitration of the RICO claim because the reinsurance agreement was simply one of many tools used by the defendant to commit fraud. Id. at 151. How the reinsurance contract was interpreted was not relevant to establishing the RICO claim; only its nature as a tool in the scheme was important. Id. The RICO claim did not involve a controversy arising under the agreement itself. Id. In contrast to Washburn, the August 1987 agreement here gives rise to the very relationship between the parties necessary for LCA to claim discriminatory treatment as a sales representative. That agreement is not simply a tool used by Sharp to commit antitrust violations. Moreover, the arbitration clause in Washburn did not contain the broad "arising out of or relating to" language, and was therefore narrower in scope than the clause at issue in this case. Accordingly, LCA's RPA claim arises out of and relates to the August 1987 agreement, and is therefore subject to that agreement's arbitration clause.

## III.  PROMISSORY ESTOPPEL AND *QUANTUM MERUIT* CLAIMS

LCA alleges that as a condition precedent to the January 1995 agreement, Sharp required LCA to hire Steve Kobrick as a sales representative. In exchange, Sharp promised to timely fill any orders for laptop computers and laser printers procured by Kobrick. However, Sharp allegedly failed to fill the orders. In Count IV, LCA sues Sharp under promissory estoppel and contends that only because of Sharp's promise, LCA hired and trained Kobrick. Count V asserts a claim for *quantum meruit* and seeks compensation for the unjust enrichment conferred on Sharp by LCA's employment of Kobrick.

LCA contends these claims are not subject to the 1995 agreement's arbitration clause because they are based on breach of an oral promise -- Sharp's promise to fill orders procured by Kobrick if LCA hired Kobrick -- that pre-dated the 1995 agreement and constituted a completely separate bargain. LCA argues that because this promise pre-dated the 1995 agreement, it cannot "arise out of" that agreement. LCA further argues that the promise does not relate to that agreement because the agreement did not require Sharp to fill Kobrick's orders -- even if Sharp fully complied with the terms of the 1995 agreement, LCA would still be harmed by Sharp's failure to fulfill its oral promise to fill Kobrick's orders.

Based on the Seventh Circuit's decision in Kiefer Speciality Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907 (7th Cir. 1999), the court must reject LCA's argument. In Kiefer, Tarkett and Kiefer entered a distributorship agreement under which Kiefer was a distributor for Tarkett in Illinois. Tarkett offered to enter a second distributorship agreement with Kiefer for the Kansas City market if Kiefer agreed to hire one of Tarkett's employees, Richard Rollins, to manage that market. Kiefer agreed to hire Rollins, and the parties entered the second distributorship agreement. The agreement provided for arbitration of all claims "arising out of or relating to" the agreement. Id. at 910. Kiefer eventually sued Tarkett for tortiously interfering with Kiefer's performance under the agreement when Tarkett solicited Rollins for employment. The court held the tortious interference claim was subject to the arbitration clause because it "arises from the very heart of the relationship between Kiefer and Tarkett." Id. Because the decision to enter into the second agreement was contingent on Kiefer's hiring Rollins, "the underlying contract . . . [was] bound up with the employment agreement with which Tarkett has allegedly interfered." Id. Like Kiefer, the January 1995 contract was "bound up" with the subject of LCA's promissory estoppel and *quantum meruit* claims -- Sharp's alleged breach

8

of its promise to fill orders procured by Kobrick – because the January 1995 contract was contingent on LCA's hiring Kobrick. Those claims therefore arise under and relate to the January 1995 agreement and are subject to its arbitration clause.

## CONCLUSION

The motion to compel arbitration is granted.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

August 16, 2000